IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF TENNESSEE
NASHVILLE DIVISION

| | |
|---|---|
| DARREN HASTINGS, | ) |
| Plaintiff, | ) ) ) |
| v. | ) Civil Action No. 3:08cv0147 |
| MANHEIM AUTOMOTIVE FINANCIAL SERVICES, INC., et al., | ) ) Judge Thomas A. Wiseman, Jr. ) ) |
| Defendants. | ) |

## MEMORANDUM OPINION

Plaintiff Darren Hastings filed this action against Defendant Remarketing Solutions, Inc. ("Remarketing") and nine of its affiliates seeking compensatory and punitive damages and other relief, based upon alleged retaliatory discharge and outrageous conduct. The parties have stipulated to the dismissal of the claims against the nine affiliates. Now before the Court is the Rule 12(c) Motion for Judgment on the Pleadings (Doc. No. 19) filed by Remarketing as the sole remaining defendant. Plaintiff has responded to the motion (Doc. 27) and Remarketing, with the Court's permission, filed a reply brief (Doc. No. 32).

Having reviewed the entire record in this matter and considered the parties' various arguments, the Court finds, as discussed in greater detail below, that Defendant Remarketing is entitled to judgment in its favor as a matter of law. Its motion will therefore be granted and this matter dismissed.

**I.  STANDARD OF REVIEW**

Under Rule 12(c), a party may move for judgment on the pleadings "[a]fter the pleadings are closed but within such time as not to delay the trial." Fed. R. Civ. P. 12(c). Generally speaking, a motion for judgment on the pleadings is considered under the same standard of review as a motion to dismiss under Rule 12(b)(6). *Kottmyer v. Maas*, 436 F.3d 684, 689 (6th Cir. 2006); *Grindstaff v. Green*, 133 F.3d 416, 421 (6th Cir. 1998). The primary distinction between the two types of motions is that, where Rule 12(b)(6) is typically concerned with the technical sufficiency of the allegations in the complaint, Rule 12(c) is concerned with the merits of the matter. Such a motion asks whether, accepting the truth of the allegations and assuming *arguendo* that the plaintiff has stated a technically valid claim, the defendant nevertheless entitled to judgment on the merits. *See Reed Elsevier, Inc. v. The Law.net Corp.*, 269

F.Supp.2d 942, 947 (S.D. Ohio 2003) (citing 5A Charles Alan Wright & Arthur R. Miller, Federal Practice and Procedure §§ 1367, 1368 & 1369 (2d ed. 1990)). Under either rule, however, the Court must construe the complaint in the light most favorable to the plaintiff, accept all the complaint's factual allegations as true, and determine whether "it appears beyond doubt that the plaintiff can prove no set of facts in support of his claim which would entitle him to relief." *Conley v. Gibson*, 355 U.S. 41, 45–46 (1957). The Court may not grant a motion to dismiss based upon a disbelief of a complaint's factual allegations, as the Court may neither weigh evidence nor evaluate the credibility of witnesses. *Miller v. Currie*, 50 F.3d 373, 377 (6th Cir. 1995). Bare assertions of legal conclusions, however, are insufficient to support a claim. *Scheid v. Fanny Farmer Candy Shops, Inc.*, 859 F.2d 434, 436 (6th Cir.1988).

If, on a motion for judgment on the pleadings, matters outside the pleadings are presented to and not excluded by the court, the motion must be treated as one for summary judgment and disposed of as provided in Rule 56, and all parties given reasonable opportunity to present all material made pertinent to such a motion by Rule 56. Fed. R. Civ. P. 12(c). Rule 10 further provides, however, that "[a] copy of any written instrument which is an exhibit to a pleading is a part thereof for all purposes." Fed. R. Civ. P. 10(c). Rule 10 has been construed to mean that if the plaintiff chooses not to attach pertinent documents to his complaint, the defendant may introduce them in connection with a motion to dismiss without thereby converting it into a motion for summary judgment. *See* 5 Wright & Miller, supra, § 1327, at 762-63. Otherwise, a plaintiff with a legally deficient claim could survive a motion to dismiss simply by failing to attach a dispositive document upon which it relied. Hence, the Sixth Circuit has held that "[d]ocuments that a defendant attaches to a motion to dismiss are considered part of the pleadings if they are referred to in the plaintiff's complaint and are central to her claim." *Weiner v. Klais & Co.*, 108 F.3d 86, 89 (6th Cir. 1997) (quoting *Venture Assocs. Corp. v. Zenith Data Sys. Corp.*, 987 F.2d 429, 431 (7th Cir. 1993)); *see also Greenberg v. Life Ins. Co. of Va.*, 177 F.3d 507, 514 (6th Cir. 1999) (holding that the district court did not err in considering, on a motion to dismiss, the plaintiff's insurance policies as they were "referred to throughout the complaint" and were central to the plaintiffs' claims).

## II. FACTUAL BACKGROUND

In view of the applicable standard of review, the facts below are taken directly from the plaintiff's complaint unless otherwise indicated and are construed in the light most favorable to the plaintiff:

Mr. Hastings was employed by Remarketing as in-house legal counsel in its Nashville, Tennessee offices beginning in July 2007. On Thursday, January 10, 2008, another Remarketing employee, Debbie Fossett, forwarded to Mr. Hastings a fully executed Service Agreement by and between Remarketing and a new client, Members 1st Credit Union ("Members 1st"), in order for Mr. Hastings to "set up" the new client in Remarketing's accounting system.

Upon receipt of the Service Agreement, Mr. Hastings noticed that the space on the first page where the contract's "effective date" should have been inserted had instead been left blank, and neither the client nor Remarketing's corporate representative had dated their respective signatures upon signing the contract. Mr. Hastings called Ms. Fossett and told her that a new contract with the intended effective date included on it needed to be forwarded to the client for a new signature.

Ms. Fossett allegedly became irate with Mr. Hastings at this suggestion and demanded that he "backdate" the contract to December 19, 2007 by either writing in that date himself in ink or by replacing the first page of the agreement with a page that had the effective date typewritten into the blank space. (Compl. ¶ 8.) Ms. Fossett told Mr. Hastings that the December 19 date was based on the date of the Power of Attorney executed by both parties and attached as an exhibit to the Agreement.

Mr. Hastings, allegedly fearing the loss of his job in doing so, communicated to Ms. Fossett that neither of these alternatives to his advice was acceptable. He explained that the Power of Attorney had not been executed by the same person who signed the Service Agreement, and the effective date of the former had no bearing on the intended effective date of the latter. He also explained to Ms. Fossett his opinion that unilaterally inserting the date in the fashion she suggested would constitute fraud in the execution of the agreement since the actual effective date should have been agreed upon by the parties and incorporated into the Agreement prior to its execution.

Shortly after this conversation, Mr. Hastings reported it to his immediate supervisor, Denay Payton. Ms. Payton's reaction was first to inform Mr. Hastings that he should have proposed to Ms. Fossett some alternative solutions other than returning the agreement to the client to be re-executed. Ms. Payton did not direct Mr. Hastings to comply with Ms. Fossett's demand or even suggest that he erred in refusing to comply with it. Instead, she suggested he draft an "Amendment" to the Service Agreement documenting the effective date. Mr. Hastings responded that an Amendment would require the client's

signature and thus knowledge of the mistake and in any event would not be effective because, in his opinion, the absence of an effective date on the Service Agreement rendered it "illusory" such that legally there was nothing to amend.[1]

According to Remarketing, Ms. Payton's recommendation was followed despite Mr. Hastings' initial misgivings: An "Addendum" to the Agreement was in fact prepared and signed by both Members 1st and Remarketing, confirming that the intended "Effective Date" of the Agreement was December 17, 2007—the date Ms. Fossett had suggested. A fully executed copy of the Service Agreement with the Power of Attorney and Addendum is attached as an exhibit to Remarketing's brief in support of its motion.[2]

The next day, Friday, January 11, 2008, Mr. Hastings had a meeting with Remarketing Group Vice President David Young, who purportedly told Mr. Hastings he was not a "team player" and did not seem to be a "corroborative" [sic, presumably meaning "cooperative"] person. (Compl. ¶ 11.) Mr. Young asked Mr. Hastings to come back to work on Monday, January 14, 2008 with a "list of things that would make him happy," that maybe the company could meet those needs but perhaps not. Mr. Hastings responded that the only items on such a list would be that he not be asked to do unethical or illegal things and that he be "unquestionably supported by Denay Payton and upper management whenever he refused to do so." (Compl. ¶ 12.) Mr. Young allegedly also told Mr. Hastings that "without 'sales' we 'wouldn't have a paycheck' " and that as "Contracts Manager" Mr. Hastings' role vis-à-vis Ms. Fossett was to support her and help her "save face" in light of her mistake. Mr. Hastings responded that his job as staff attorney was not to help a salesperson "save face" but to make sure the company was in compliance with its legal obligations. (Compl. ¶ 12.)

The following Monday, January 14, Human Resources Director Joann Williams came to Mr.

---

[1] The Court takes notice that Mr. Hastings' objection was not a correct statement of Tennessee law, but that fact is not material.

[2] Remarketing takes the position that, although the Addendum was not attached to or referenced in the plaintiff's original complaint, the Service Agreement itself was referenced in and is in fact central to Mr. Hastings' claims. Remarketing argues that the Court may consider the complete Service Agreement, Addendum included, without converting its 12(c) motion to dismiss into a Rule 54 motion for summary judgment. The Court agrees. *See Greenberg v. Life Ins. Co. of Va.*, 177 F.3d 507, 514 (6th Cir. 1999) (noting that "when a document is referred to in the complaint and is central to the plaintiff's claim," a defendant "may submit an authentic copy to the court to be considered on a motion to dismiss"). Plaintiff does not contest the authenticity of the Service Agreement or Addendum, nor does he argue that its consideration would require converting the defendant's motion into one for summary judgment.

Hastings' office and asked him to meet with her and Mr. Young at 10:00 a.m. that same morning. At the meeting, Mr. Young told Mr. Hastings that he was not "working out" and that they needed to "wrap things up." (Compl. ¶ 14.) Mr. Hastings stated that if Mr. Young was asking him to resign voluntarily, he would not do so because he had done nothing wrong, and that Mr. Young would have to fire him if he wanted him to leave. Mr. Young fired Mr. Hastings.

Mr. Hastings alleges that at that point he was directed by Ms. Williams, a management employee, to leave the premises immediately. When Mr. Hastings responded that he would be leaving as soon as he had retrieved his personal effects from his office, Ms. Williams purportedly informed him that she would call the police. Mr. Hastings stated that that would be fine, as he was within his rights to gather his personal belongings. Mr. Hastings does not indicate that the police were actually called, nor does he allege he was ultimately prevented from retrieving his belongings.

### III. ANALYSIS

On the basis of the factual allegations set forth above, Mr. Hastings has brought claims for retaliatory discharge under both Tennessee common-law and Tennessee statute, the Tennessee Public Protection Act ("TPPA"), Tenn. Code Ann. § 50-1-304, and a claim for "outrageous conduct." In its motion, defendant Remarketing seeks dismissal of each of these claims as a matter of law.

#### A. Retaliatory Discharge Claim

"The employment-at-will doctrine is a bedrock of Tennessee common law." *Franklin v. Swift Transp. Co.*, 210 S.W.3d 521, 527 (Tenn. Ct. App. 2006). Under this doctrine, employment for an indefinite term may be terminated by either the employer or the employee at any time, for good cause, bad cause, or no cause at all. *Guy v. Mutual of Omaha Ins. Co.*, 79 S.W.3d 528, 534-35 (Tenn. 2002). This rule is not absolute, however, and certain restrictions have been imposed on the right of an employer to discharge an employee. *Id.* at 535. As specifically pertinent to this case, both the TPPA and a common-law claim for retaliatory discharge protect an employee from having to choose between complying with the law, or reporting workplace illegalities to the proper authorities, and remaining employed. *See, e.g.*, *Caruso v. St. Jude Children's Research Hosp., Inc.*, 215 F. Supp. 2d 930, 937 (W.D. Tenn. 2002).

The TPPA, originally passed in 1990, "is cumulative to, and does not preempt, the common law

tort remedy for retaliatory discharge claims where the employee was discharged for reporting illegal or unethical conduct." *Guy*, 79 S.W.3d at 537. Although the statute and the common law doctrine are similar and both prohibit retaliatory discharge, the elements of the two causes of action are not identical. The TPPA, commonly known as the "whistleblower" statute, provides in pertinent part that "[n]o employee shall be discharged or terminated solely for refusing to participate in, or for refusing to remain silent about, illegal activities." Tenn. Code Ann. § 50-1-304(a). Four elements are necessary for the existence of a cause of action for a violation of the Public Protection Act: "(1) The plaintiff's status as an employee of the defendant, (2) the plaintiff's refusal to participate in, or to remain silent about, illegal activities, (3) the employer's discharge of the employee, and (4) an exclusive causal relationship between the plaintiff's refusal to participate in or to remain silent about illegal activities and the employer's termination of the employee." *Merryman v. Cent. Parking Sys., Inc.*, No. 01A01-9203-CH-00076, 1992 WL 330404, *6 (Tenn. Ct. App. Nov. 13, 1992). The TPPA defines the term "illegal activities" as "activities that are in violation of the criminal or civil code of this state or the United States or any regulation intended to protect the public health, safety or welfare." Tenn. Code Ann. § 50-1-304(c).

Similarly, to state a claim for Tennessee common law retaliatory discharge, a plaintiff-employee must show that (1) an employment-at-will relationship existed; (2) he was discharged; (3) the reason for his discharge was that he attempted to exercise a statutory or constitutional right, or for any other reason which violates a clear public policy evidenced by an unambiguous constitutional, statutory, or regulatory provision; and (4) that a substantial factor in his employer's decision to discharge him was his exercise of protected rights or compliance with clear public policy. *Crews v. Buckman Laboratories Int'l, Inc.*, 78 S.W.3d 852, 862 (Tenn. 2002). *See also Guy v. Mutual of Omaha Ins. Co.*, 79 S.W.3d 528, 535 (Tenn. 2002). The primary distinction between the statutory and common-law causes of action is that to prevail on a statutory claim, the plaintiff must show that the *sole* reason for his discharge was his refusal to participate in or to remain silent about illegal activities, as opposed to showing that his refusal was a "substantial" reason.[3] *Collins v. AmSouth Bank*, 241 S.W.3d 879, 884 (Tenn. Ct. App. 2007).

---

[3] There are other differences which are not relevant here. For example, the common-law claim requires a showing that the employee is an employee-at-will rather than simply an employee. *See, e.g.*, *Conley v. Yellow Freight Sys., Inc.*, 521 F. Supp. 2d 713, 730–31 (E.D. Tenn. 1997) (dismissing plaintiff's common-law under Tennessee common law for retaliatory discharge where the plaintiff failed to demonstrate at-will employment status).

In Mr. Hastings' case, there is no dispute that he was an at-will employee of Remarketing and he was discharged, so those elements of both the statutory and common-law claims are met. Remarketing maintains that the claims must be dismissed because Mr. Hastings cannot demonstrate the existence of any "illegal activities" by Remarketing, much less any illegal activity that he was forced to remain silent about or pressured to participate in during the course of his employment. Likewise, with respect to the common-law claim, Remarketing argues that Mr. Hastings has not demonstrated that he attempted to exercise some statutory or constitutional right, or that he was discharged for "any other reason which violates a clear public policy evidenced by an unambiguous constitutional, statutory, or regulatory provision." *Guy*, 79 S.W.3d at 535.

In fact, it appears the only purportedly "illegal activity" referenced in the Complaint is Ms. Fossett's irate demand that Mr. Hastings insert the date December 19, 2007 into the already executed Agreement. Mr. Hastings refused to do so, stating that it would constitute "fraud in the execution of the agreement." (Compl. ¶ 9.) Remarketing argues that writing in the date under the circumstances would not have qualified as fraud of any kind, and that Hastings has not otherwise indicated how adding the date into a contract after its execution qualifies as an illegal activity or somehow violated a clear public policy evidenced by an unambiguous constitutional, statutory or regulatory provision. Remarketing further argues that, even if Ms. Fossett's request was somehow improper, Mr. Hastings does not allege that she was his supervisor or a manager at all, nor does he allege that Ms. Payton or any other member of Remarketing's management reiterated Ms. Fossett's "demand" or otherwise asked Mr. Hastings to do anything illegal. Instead, Ms. Payton indicated that Mr. Hastings' mistake with Ms. Fossett was that he did not offer any other possible alternative solutions to the problem posed by the undated contract, other than one that required informing the client of the mistake and execution of a new contract. She herself suggested the alternative of an "amendment" to the original Agreement. (Compl. ¶ 10.) Mr. Hastings does not appear to claim that drafting an Amendment to the Service Agreement would be somehow illegal. In fact, as Remarketing points out, Mr. Hastings ultimately complied with this suggestion.

In response to Remarketing's arguments, Hastings emphatically contends that unilaterally backdating the contract, as Ms. Fossett "demanded" he do, would have constituted fraud, apparently regardless of whether the other party to the contract likewise intended December 17, 2007 to be the

contract's effective date. Mr. Hastings cites to the Tennessee Criminal Code's definition of the term "fraud" in support of his argument: " 'Fraud' means as used in normal parlance and includes, but is not limited to, deceit, trickery, misrepresentation and subterfuge, and shall be broadly construed to accomplish the purposes of this title." Tenn. Code Ann. § 39-11-106(13).

The fact that both parties to the Service Agreement ultimately executed the Amendment shows that both parties intended December 17, 2007 to be the contract's effective date. Moreover, Ms. Fossett obviously did not intend to "deceive" Members 1st by having Mr. Hastings write in that date, nor to obtain some advantage for Remarketing to which it was not otherwise entitled by the terms of the contract; rather, she apparently, based on Mr. Hastings' allegations, hoped to facilitate Mr. Hastings' entering the contract into Remarketing's system without having to go back to the client for another signature. Mr. Hastings does not allege anywhere that December 17 was not the effective date intended by both parties. Rather, his allegations give rise to an inference that he had no way of knowing for sure as of the time of Ms. Fossett's demand whether both parties intended that date to be the effective date. Regardless, if Mr. Hastings had complied with Ms. Fossett's demand, and an issue as to the agreement's effective date had later arisen, Members 1st would only have had to look at its own copy of the agreement to verify that no date was included on the original document. Presumably, as Remarketing suggests, the parties' correspondence prior to executing the agreement, other documents executed contemporaneously with it, or the parties' performance after execution would have served to demonstrate whether December 17 was the actual intended date. In any event, Ms. Fossett's "demand" that Mr. Hastings write in the date cannot be construed as a demand that he commit fraud because there was no deception involved, no potential injury, and little likelihood that Members 1st ever would have learned that Remarketing had later inserted the (correct) date into the contract.

Mr. Hastings also argues that the TPPA protects employees who have "reasonable cause" to believe the subject activity would have been illegal, citing *Mason v. Seaton*, 942 S.W.2d 470, 472 (Tenn. 1997). In fact *Mason* and other similar cases stand for the proposition that the TPPA protects employees who reasonably suspect their employer of engaging in illegal activity, not that the TPPA protects employees who reasonably, but erroneously, believe the activity in which the employer is engaged is illegal. *Cf. Mason*, 942 S.W.2d at 472 (where the defendant contended that the activities reported by the

plaintiff were not illegal within the meaning of the statute, the Tennessee Supreme Court found that the testimony of an industrial safety expert that the situation about which plaintiff complained created a dangerous working condition and the existence of code violations were sufficient evidence of illegal activity to overcome a motion for summary judgment); *Franklin v. Swift Transp. Co.*, 210 S.W.3d at 528 (finding that the appeal turned on whether the act the plaintiff believed to be illegal actually violated any law, regulation or public policy, and affirming judgment for the defendant on the grounds that it did not, regardless of the plaintiff's "reasonable belief" to the contrary, and stating, "Under the Public Protection Act, it must be found that the violation by the employer constitutes an "illegal activity. . . .").

In any event, the law is clear that under both the TPPA and the common law, "the 'illegal activity' or violation by the employer must implicate important public policy concerns." *Franklin*, 210 S.W.3d at 530. The employee must show that he was discharged because of his "refusal to participate in, or to remain silent about, illegal activities." *Id.* Here, the facts as construed in the light most favorable to the plaintiff suggest that Ms. Fossett wanted Mr. Hastings to do something he believed was unethical. He refused. Because he refused, there was no on-going "illegal activity" on the part of the employer either to report or in which he could have participated, as required for a TPPA claim. In other words, there is no implication that Remarketing as an entity was regularly engaged in a practice of fraudulently changing the terms of its written contracts.

Accordingly, Mr. Hastings has not stated a claim under the common-law either. Under the common law, the motivating factor for the discharge must be the employee's compliance with "a clear public policy evidenced by an unambiguous constitutional, statutory, or regulatory provision." *Crews*, 78 S.W.3d at 862. Mr. Hastings has not pointed to any such provision that would apply here. Moreover, Tennessee cases make it clear that "[p]ersons asserting either a statutory or common-law whistleblowing claim must prove more than that their employer violated a law or regulation. They must prove that their efforts to bring to light an illegal or unsafe practice furthered an important public policy interest, rather than simply their personal interest. *Collins*, 241 S.W.3d at 885 (citing *Guy v. Mut. of Omaha Ins. Co.*, 79 S.W.3d at 538; *Franklin v. Swift Transp. Co., Inc.*, 210 S.W.3d at 531). Even assuming that it would have been improper for Mr. Hastings, as an attorney, unilaterally to insert a date into the contract without, at a minimum, confirming with the other party to the contract whether that was in fact the intended effective

date, that does not implicate a sufficiently important public policy interest to support a claim for retaliatory discharge based on Mr. Hastings' allegations. *Cf. Stein v. Davidson Hotel*, 945 S.W.2d 714, 717 (Tenn. 1997) (underscoring the qualified nature of the cause of action, noting that retaliatory discharge is applicable only "in limited circumstances, [where] certain well-defined, unambiguous principles of public policy confer upon employees implicit rights which must not be circumscribed or chilled by the potential of termination"); *Guy*, 79 S.W.3d at 531–33, 538 (framing the issue presented as "whether the plaintiff has asserted a 'well defined and established' public policy as the basis for his retaliatory discharge claim," and emphasizing that it was not enough for the plaintiff to simply show that the employer violated a law or regulation; "rather, our inquiry focuses on whether some ' important public policy interest embodied in the law has been furthered by the whistleblowing activity.' " (quoting *Gutierrez v. Sundancer Indian Jewelry*, 868 P.2d 1266, 1273 (N.M. 1993))); *Crews v. Buckman Labs. Int'l, Inc.*, 78 S.W.3d 852, 865 (Tenn. 2002) (where the plaintiff was discharged for reporting in-house counsel practicing law without being properly licensed, the court found "the existence of a clear public policy evidenced by the ethical duty [under the Tennessee Code of Professional Responsibility] not to aid in the unauthorized practice of law").

Because Mr. Hastings has not in this case identified any unambiguously illegal activity or his engagement in any action protected by clear public policy, the Defendant's motion to dismiss his claims for retaliatory discharge under both the TPPA and Tennessee common law will be granted.

### B. Outrageous Conduct Claim

Mr. Hastings also seeks to recover for the tort of "outrageous conduct," also known as intentional infliction of emotional distress. *See Bain v. Wells*, 936 S.W.2d 618, 622 n.3 (Tenn. 1997) ("The tort of intentional infliction of emotional distress and outrageous conduct are not two separate torts, but are simply different names for the same cause of action."). The Tennessee Supreme Court has summarized the elements of an outrageous conduct claim as follows:

> [U]nder Tennessee law, there are three essential elements to [an outrageous conduct] cause of action: (1) the conduct complained of must be intentional or reckless; (2) the conduct must be so outrageous that it is not tolerated by civilized society; and (3) the conduct complained of must result in serious mental injury.

*Id.* With regard to whether actions are "outrageous," Tennessee adheres to the following standard:

> It has not been enough that the defendant has acted with an intent which is tortious or even criminal, or that he has intended to inflict emotional distress, or even that his conduct has been characterized by "malice" or a degree of aggravation which would

> entitle the plaintiff to punitive damages for another tort. Liability has been found only where the conduct has been so outrageous in character and so extreme in degree, as to go beyond all bounds of decency, and to be regarded as atrocious and utterly intolerable in a civilized community. Generally, the case is one in which the recitation of the facts to an average member of the community would arouse his resentment against the actor, and lead him to exclaim, "Outrageous."

*Id.* at 623 (quoting Restatement (Second) of Torts § 46 comment d (1964), and *Medlin v. Allied Inv. Co.*, 398 S.W.2d 270, 274 (Tenn. 1966) (abrogated on other grounds by *Camper v. Minor*, 915 S.W.2d 437, 444–46 (Tenn. 1996))). Comment d further provides that liability for intentional infliction of emotional distress "clearly does not extend to mere insults, indignities, threats, annoyances, petty oppressions, or other trivialities."

Remarketing argues that, even assuming the truth of all Mr. Hastings' allegations, the conduct of which Mr. Hastings complains was not sufficiently egregious to support a claim for outrageous conduct / intentional infliction of emotional distress. Mr. Hastings argues in response that it is for the eventual finder of fact in this case to determine whether Remarketing's alleged actions—"fir[ing] a staff lawyer for refusing to be complicit in the fraudulent backdating of a contract and then tr[ying] to refuse him the personal property in his office"—would outrage an average member of the community.

Mr. Hastings is incorrect. "It is for the court to determine, in the first instance, whether the defendant's conduct may reasonably be regarded as so extreme and outrageous as to permit recovery." Restatement (Second) of Torts § 46(1) cmt. h, *quoted in Medlin v. Allied Inv. Co.*, 398 S.W.2d 270, 275 (Tenn. 1966); *see also Alexander v. Inman*, 825 S.W.2d 102, 105 (Tenn. Ct. App. 1991). In this case, the Court finds that Mr. Hastings' allegations do not meet this "extremely high standard" of outrageousness. *Compare, e.g.*, *Jones v. Tenn. Valley Auth.*, 948 F.2d 258, 266 (6th Cir. 1991) (affirming the district court's summary judgment of plaintiff's claim of intentional infliction of emotional distress, stating: "Considering the evidence in the light most favorable to the plaintiff, it shows that plaintiff's supervisors intimidated him by assigning him to menial tasks, unfairly reprimanded him, gave him low performance appraisal, monitored his communications with the NRC and Congressional investigators, attempted to gain his medical records, and barred him from promotions, bonuses and raises. While such conduct may be tortious, it is not so 'outrageous' so as to be beyond the pale of decency."); *McNeail-Tunstall v. Marsh USA*, 307 F. Supp. 2d 955, 976 (W.D. Tenn. 2004) (holding that alleging a violation of federal anti-discrimination law, "without additional evidence showing conduct so outrageous as not to be tolerated in

civilized society, is simply insufficient to prove intentional infliction of emotional distress"); *Johnson v. Cantrell*, 1999 WL 5083 (Tenn. Ct. App. Jan. 7, 1999) (affirming summary judgment in favor of the defendant on plaintiffs' outrageous-conduct claim where the plaintiffs alleged that the defendant "shouted at [plaintiff] in a loud and abusive manner, using offensive and profane language[,] and that he threatened to have her arrested; the entire incident lasted only about ten minutes and while "[t]his conduct was obviously upsetting to [plaintiff] and may be classified as rude, offensive, and otherwise inappropriate. . . ., it may not be said, and a reasonable jury could not find, that the conduct was outrageous"); *with Lourcey v. Estate of Scarlett*, 146 S.W.3d 48, 52 (Tenn. 2004) (finding plaintiff's allegations sufficient to support a claim of outrageous conduct where defendant told plaintiff his wife was having a seizure and, as plaintiff was calling 911 for help, defendant shot his wife in the head, turned to face the plaintiff, put a pistol to his own head, pulled the trigger, and killed himself); *Pollard v. E.I. DuPont de Nemours Co.*, 213 F.3d 933, 947 (6th Cir. 2000) (finding a fact issue on outrageousness when plaintiff suffered consistent harassment over several years, her work was sabotaged, she was subjected to juvenile pranks, her personal safety was compromised, she was forced to resign from her shift, and she was constantly told that women were inferior), *rev'd on other grounds*, 532 U.S. 843 (2001); *Evans v. Detlefsen*, 857 F.2d 330, 337 (6th Cir. 1988) (finding evidence sufficient to support outrageousness when plaintiff suffered personal vindictiveness, threats, intimidation, and verbal and physical abuse from a police officer after a minor traffic offense).

Defendant's motion for judgment will therefore be granted with regard to plaintiff's claim for outrageous conduct.

### IV. CONCLUSION

For the reasons set forth above, Defendant Remarketing Solutions' motion for judgment on the pleadings will be granted. An appropriate Order will enter.

Thomas A. Wiseman, Jr.
Senior U.S. District Judge